### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| TINA BOYD, ) | |
| ) | |
| Plaintiff, ) | |
| ) | C.A. No. _____ |
| v. ) | |
| ) | JURY TRIAL DEMANDED |
| MOUNTAIRE FARMS OF DELAWARE, ) | |
| INC., ) | |
| ) | |
| Defendant. ) | |

### COMPLAINT

**Parties & Background**

1.  Plaintiff Tina Boyd ("Ms. Boyd") is an African-American female who, at all times relevant, was over the age of 40. Ms. Boyd is a resident of Millsboro, Sussex County, Delaware.

2.  Defendant Mountaire Farms of Delaware, Inc. ("Mountaire"), is a Delaware corporation that has in excess of 500 employees. Mountaire is a wholly-owned subsidiary of Mountaire Corporation. At all times relevant, Mountaire was operating a chicken processing plant in Selbyville, Delaware (the "Facility"), which, alone, had over 1,800 employees.

**Jurisdiction & Venue**

3.  This Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1343. This Court also has jurisdiction over the related State law claims pursuant to 28 U.S.C. § 1367.

4.  Venue in this Court is proper under 28. U.S.C. § 1391, and this court has personal jurisdiction over the Defendants in this matter because the events giving rise to these claims occurred in this District.

1

## The Administrative Process

5. Ms. Boyd filed a *pro se* Charge of Discrimination against Mountaire with the United States Equal Employment Opportunity Commission ("EEOC") on March 14, 2022. She alleged discrimination on the bases of race, color, sex/gender, age, disability as well as retaliation. The EEOC assigned her Charge a Charge Number of 530-2022-01647.

6. After retaining counsel, Ms. Boyd filed an Amended Charge on June 22, 2022. In it, she alleged discrimination based upon race and sex/gender as well as retaliation and constructive discharge.

7. On January 24, 2023, the EEOC issued a Right to Sue Letter to Ms. Boyd.

## Ms. Boyd is Hired by Mountaire

8. Ms. Boyd was hired by Mountaire in August 2020 and began working for Mountaire on or about August 31, 2020 as the Complex Human Resources manager for the Facility.

9. Ms. Boyd worked in that position between August 31, 2020, and December 2021. She had seven to nine employees who reported directly to her, and there were between 32 and 37 employees under her at the facility. Her salary was approximately $136,000.

10. Ms. Boyd was hired by Kandy Grenier, a white female, who was the Vice-President of Human Resources at Mountaire. Grenier left two to three months after Ms. Boyd started.

11. In the human resources hierarchy at Mountaire, Rodrigo Lozano ("Lozano") was the Senior Director of Human Resources, and he reported to Grenier.

12. Reporting to Lozano was Michel Rush ("Rush"), a white male who was the Director of Human Resources for the Facility and a plant in Millsboro, Delaware. Ms. Boyd reported directly to Rush.

13. Rush left approximately three months after Grenier.

14. Grenier was replaced by Kurt Schrock ("Schrock"), a white male.

15. Approximately six to seven months into her employment with Mountaire, Ms. Boyd was on a human resources phone call. On that call Lozano complimented Ms. Boyd for her work in bridging a gap between human resources and the operations at Mountaire, which was something Lozano said he had not seen during his tenure.

### Ms. Boyd is Passed Over for a Promotion for a Less Qualified White Male

16. Dale Cook ("Cook"), a white man, was a close friend of Schrock who had previously worked with Schrock at Tyson. Upon information and belief, Cook only had a bachelor's degree and 11-12 years of human resources experience. Before Rush's departure, Cook had the same position as Ms. Boyd except that Cook was in Mountaire's Millsboro, Delaware plant.

17. When Ms. Boyd and Cook were peers, the Facility consistently out-performed the Millsboro plant. Additionally, Ms. Boyd often shared her ideas and activities about employee engagement with the Millsboro plant because Cook was admittedly not good with employee engagement.

18. Ms. Boyd applied for the Director of Human Resources job vacated by Rush. That job paid a salary of approximately $175,000. Ms. Boyd's qualifications for that job included an MBA degree, 25 years of human resources experience, and two human resources certifications.

19. Before applying for the job, Ms. Boyd inquired as to why Rush left Mountaire. She was told by Lozano that Rush left voluntarily.

20. Both Ms. Boyd and Cook were interviewed for the position of Director of Human Resources. Ms. Boyd was interviewed by Dyan Connolly, Director of Learning and Development, Patrick Townsend, Director of HR Compensation, and Lozano.

21. Despite being less qualified for the Director of Human Resources job than Ms. Boyd, Schrock gave Cook the Director of Human Resources job in late June 2021. Ms. Boyd was notified at or about the same time that she did not get the job.

22. Cook began working for Mountaire in the beginning of July 2021 as the Director of Human Resources for the Facility and for a plant in Millsboro, Delaware.

### Ms. Boyd is Harassed by the Less Qualified White Male

23. Almost immediately after Cook began in July 2021, Cook started harassing Ms. Boyd by micro-managing her and criticizing her about practices for which she had never been criticized.

24. At the end of June 2021, Ms. Boyd attended a meeting with all other Complex Human Resources managers for Mountaire. April Tucker, a human resources manager for live operations, asked about the reports. April Tucker had no direct reports, so she had to run her own reports. Ms. Boyd told April Tucker that her human resources administrator or employment manager ran a regular report for her. No one at the meeting, including her superiors, told her she should be running the report herself. Cook, however, overheard this conversation. As soon as Cook started as Director of Human Relations in July 2021, he questioned Ms. Boyd about these reports and told her that she herself must run them.

25. The human resources managers had many reports to run. Ms. Boyd created a guide for managers and supervisors to better understand the reporting. She also attempted to use Mountaire's Power BI software to consolidate the many reports that contained duplicate information. Cook told Ms. Boyd, however, that Lozano said she could not use the Power BI software. Cook said she had to use Microsoft Excel instead.

26. During the week prior to July 23, 2021, Lozano came to the Facility. He asked Ms. Boyd how things were going between her and Cook. Ms. Boyd told Lozan that Cook was micromanaging her. Lozano said the micromanaging could be the result of something he said, but Lozano said he would let Cook and Ms. Boyd work it out.

27. On July 23, 2021, Cook became upset that Ms. Boyd had attended an off-site meeting. Ms. Boyd called Cook asking why he was micromanaging her time and work duties. Cook responded that he did not feel that she was sufficiently engaged.

28. Between July 23 and 24, 2021, Ms. Boyd called Lozano to express her concerns about the situation with Cook.

29. On July 26, 2021, Ms. Boyd emailed a letter to Lozano outlining her concerns about Cook, including his micromanaging of her, her loss of autonomy, his double-checking of simple tasks, the lack of transparency, and his overall behavior towards her.

30. Lozano scheduled a meeting for the first week of August 2021. During the meeting, Ms. Boyd again express her concerns about Cook. She said Cook's expectations of her were different than the expectations set forth in her job description and by Lozano. Ms. Boyd said Cook seems to require her to read his mind and, on occasion, yells at her.

31. The August 2021 meeting seemed to end on good terms with everyone agreeing to move forward. But Lozano soon followed up with an email to Ms. Boyd stating that her complaints were the result of her not getting the Director of Human Resources job. Ms. Boyd refuted Lozano's position and stated she only wanted to be treated fairly and professionally.

32. Things between Ms. Boyd and Cook improved for a couple of weeks, but Cook's harassment of Ms. Boyd then resumed. At this point, Ms. Boyd began to realize that Lozano had

shared with Cook things that Ms. Boyd had shared with Lozano in what she believed was confidence. She also grew to believe that Lozano had shared her letter about Cook with Cook.

### Ms. Boyd's Accommodation for Her Disability is Inexplicably Taken Away

33. Ms. Boyd suffers from insomnia in connection with sleep apnea. It affects her activities of daily living because she cannot wake up early and/or regularly because she does not sleep well. This constitutes a disability under the Americans with Disabilities Act, 42 U.S.C. §§ 12101, *et seq.* ("ADA").

34. Because of her disability, Rush had allowed Ms. Boyd to work a "flex" schedule. She was available during the core business hours and after-hours. She also had a company-issued cellular telephone and was on call each day. This accommodation had worked without a problem.

35. Prior to Cook starting his new job, Ms. Boyd always arrived to work between 8:00 a.m. and 8:30 a.m. Cook discovered her arrival time. On one day when she arrived around 8:30 a.m., she was told Cook was already on the telephone line waiting for her. Cook told her that she had to be there between 7:30 a.m. and 8:00 a.m.

36. Ms. Boyd explained to Cook that she suffered from insomnia due to sleep apnea and that her CPAP machine had been recalled. This resulted in her arriving to work between 8:00 a.m. and 8:30 a.m. Ms. Boyd explained that the next available appointment to address the CPAP machine was in December. Cook's responded by telling her to buy a new CPAP machine.

37. On another occasion, her primary care physician had given her a sleeping pill, which caused her to oversleep and miss a meeting. She explained this to Cook, who had her written up.

38. Lozano was also aware of her medical condition. He told Ms. Boyd that she knew what to do about her medical condition, but he was not going to tell her what to do about it.

6

**Ms. Boyd Takes Medical Leave**

39. All of the harassment and micromanagement directed by Cook to Ms. Boyd began to have an effect upon Ms. Boyd's health.

40. In or about November 2021, Ms. Boyd had to take medical leave under the Family and Medical Leave Act, 29 U.S.C. §§ 2601, *et seq.* ("FMLA").

41. She informed Cook of her FMLA leave around 9:30 a.m. or 10:00 a.m. during a meeting on Friday, November 12, 2021. Cook said nothing about it. Later, around 5:00 p.m. on November 12, 2021, Cook told Ms. Boyd that he was going to investigate Ms. Boyd while she was on leave.

42. On Saturday, November 13, 2021, Cook emailed Ms. Boyd while she was on FMLA leave stating he had completed his investigation and would address it with her when she returned. During Cook's one-day investigation, he never asked Ms. Boyd any questions about the issue or took any statement from her.

43. Ms. Boyd returned from FMLA leave on or about December 20, 2021.

44. On December 21, 2021, Cook went over Ms. Boyd's performance review with her. He told her she would receive an unsatisfactory review. He told her it had nothing to do with her performance because she knew human resources very well. The reason for the unsatisfactory review was because Cook felt Ms. Boyd was not committed.

45. Cook also justified the unsatisfactory review because a female employee Cook hired, Rebecca, was frustrated with how the orientation process was going. Significantly, the orientation program was created and implemented by Cook, but he faulted Ms. Boyd for its failures.

46. Cook also claimed that employees who left the company for poor performance had made complaints about Ms. Boyd. Ms. Boyd had asked Lozano to investigate those claims at the time they were made, but Lozano declined to do so stating that he trusted Ms. Boyd and would continue to do so until she gave him a reason not to trust her. Moreover, both Cook and Lozano had previously told Ms. Boyd those complaints would not be used against her. Ms. Boyd also understood Schrock was not going to use those complaints against her.

47. Ms. Boyd told Cook she disagreed with the performance review, asked about the due diligence in the investigation, and asked for an opportunity to defend the allegations. Cook said he was not going to argue with her. Cook refused to listen to Ms. Boyd and said the review would be written as he saw appropriate.

### Ms. Boyd is Constructively Discharged by Mountaire

48. Ms. Boyd left the Facility on December 21, 2021. She then sent a text message stating that she was resigning from Mountaire effective immediately.

49. Ms. Boyd was replaced by Rosa Rosalina ("Rosalina"), a Hispanic female, who was, upon information and belief, approximately seven years younger than Ms. Boyd. Despite not having any degree from an institution of higher education or any formal human resources training, Cook promoted Rosalina to Ms. Boyd's position after Ms. Boyd was constructively discharged.

50. Rosalina was one of Cook's favorite employees. By way of example:

a. Prior to her promotion, an applicant who wanted to be re-hired by Mountaire raised a concern about Rosalina. To Ms. Boyd's understanding, there was some sort of family conflict between Rosalina and the applicant, who was related to Rosalina's husband. During the applicant's prior employment with Mountaire, Rosalina investigated the applicant and terminated the applicant. When the applicant re-applied, the applicant

explained the prior termination and Rosalina's involvement to Ms. Boyd. Ms. Boyd then brought the issue to Cook and indicated Rosalina had a conflict of interest when she previously investigated and terminated the applicant. Cook dismissed the applicant's complaint/concern about Rosalina and instructed Ms. Boyd not to hire the applicant. Cook never investigated the complaint against Rosalina.

b. In addition, Rosalina made a major mistake at work prior to the promotion and was never written up or disciplined for the mistake. She was then promoted

51. After she filed her Charge of Discrimination with the EEOC and attended a Fact Finding Conference, Ms. Boyd learned Rush had been fired. Oddly, one of the reasons Mountaire cited for terminating Rush – lack of engagement – was identical to the criticism Cook lodged against Ms. Boyd.

52. Also at the EEOC Fact Finding Conference, Cook asserted that Ms. Boyd did not understand the reporting processes for Mountaire despite her extensive knowledge of the reports, her attempts to consolidate the reporting to eliminate duplicate information, and her creation of the guide for other managers and supervisors to better understand the reporting.

## Ms. Boyd's Damages

53. As a result of Mountaire's intentional and reckless discrimination against Ms. Boyd, Ms. Boyd suffered the following damages:

   a. Lost income as a result of being passed over for the Director of Human Relations job in the amount of approximately $39,000 per year;

   b. Lost wages, back and front;

   c. Humiliation and embarrassment;

   d. Disruption to life; and

9

  e. Emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses.

### COUNT I – DISPARATE TREATMENT BASED UPON RACE

54. Plaintiff reincorporates all of the foregoing assertions as if they are specifically stated in this Count.

55. Ms. Boyd is in a protected class as she is an African-American woman.

56. Ms. Boyd was qualified for the job of the Director of Human Resources.

57. Despite being qualified for the job of the Director of Human Resources, Ms. Boyd was denied the promotion to the Director of Human Resources which went to a lesser qualified white male.

58. As a result of Mountaire's intentional discrimination on the basis of race, separately or in conjunction with another basis, Ms. Boyd suffered the damages identified in Paragraph 53.

59. This willful, intentional, and unlawful action violates the laws and regulations of the United States, including, without limitation 42 U.S.C. § 2000e, *et seq*.

### COUNT II – DISPARATE TREATMENT BASED UPON GENDER

60. Plaintiff reincorporates all of the foregoing assertions as if they are specifically stated in this Count.

61. Ms. Boyd is in a protected class as she is an African-American woman.

62. Ms. Boyd was qualified for the job of the Director of Human Resources.

63. Despite being qualified for the job of the Director of Human Resources, Ms. Boyd was denied the promotion to the Director of Human Resources which went to a lesser qualified white male.

64. As a result of Mountaire's intentional discrimination on the basis of gender, separately or in conjunction with another basis, Ms. Boyd suffered the damages identified in Paragraph 53.

65. This willful, intentional, and unlawful action violates the laws and regulations of the United States, including, without limitation 42 U.S.C. § 2000e, *et seq.*

### COUNT III – HOSTILE WORK ENVIRONMENT

66. Plaintiff reincorporates all of the foregoing assertions as if they are specifically stated in this Count.

67. Ms. Boyd is in a protected class as she is an African-American woman. She was subject to intentional harassment by Cook because of her race and/or gender.

68. Cook's harassment was severe or pervasive.

69. Cook's harassment would detrimentally affect a reasonable person and did, in fact, detrimentally affect Ms. Boyd.

70. Cook had the ability to fire Ms. Boyd and was therefore her supervisor.

71. Alternatively, Mountaire knew or should have known of Cook's harassment of Ms. Boyd and failed to reasonably supervise Cook allowing Ms. Boyd to be harassed.

72. As a result of Mountaire's discrimination on the basis of race and/or gender, Ms. Boyd suffered the damages identified in Paragraph 53.

73. This willful, intentional, and unlawful action violates the laws and regulations of the United States, including, without limitation 42 U.S.C. § 2000e, *et seq.*

### COUNT IV – CONSTRUCTIVE DISCHARGE

74. Plaintiff reincorporates all of the foregoing assertions as if they are specifically stated in this Count.

75. Ms. Boyd was subject to working conditions so intolerable that a reasonable person would have felt compelled to resign.

76. Ms. Boyd resigned on December 21, 2021.

77. As a result of Ms. Boyd's constructive discharge, Ms. Boyd suffered the damages stated in Paragraph 53.

78. This willful, intentional, and unlawful action violates the laws and regulations of the United States, including, without limitation 42 U.S.C. § 2000e, *et seq.*

## COUNT V – RETALIATION

79. Plaintiff reincorporates all of the foregoing assertions as if they are specifically stated in this Count.

80. Ms. Boyd notified Lozano in July 2021 that Cook was harassing her at work. Ms. Boyd had a meeting with Lozano and Cook in August 2021 about Cook's harassment.

81. The harassment continued and, when Ms. Boyd indicated she was going to take medical leave in November 2021, Cook said he was going to "investigate" her.

82. When she returned from medical leave in December 2021, Cook gave her a negative performance review, no raise, and said the "investigation" led to those conclusions. This directly and proximately led to her constructive discharge.

83. As a result of Mountaire's retaliation, Ms. Boyd suffered the damages stated in Paragraph 53.

84. This willful, intentional, and unlawful action violates the laws and regulations of the United States, including, without limitation 42 U.S.C. § 2000e, *et seq.*

### COUNT VI – FAILURE TO ACCOMMODATE

85. Plaintiff reincorporates all of the foregoing assertions as if they are specifically stated in this Count.

86. Sleep apnea is a "disability" under the Americans with Disabilities Act, 42 U.S.C. §§ 12101, *et seq.* ("ADA"). Sleep apnea affected one more of Ms. Boyd's major life activities, including her ability to get a good night's sleep and wake up in sufficient time to get to work. Her sleep apnea was also documented.

87. Rush had previously accommodated Ms. Boyd's sleep apnea by allowing her to arrive at work between 8:00 a.m. and 8:30 a.m. When Cook took over as the Director of Human Resources, however, he began requiring she arrive at work between 7:30 a.m. and 8:00 a.m. When Ms. Boyd explained her disability and the prior accommodation, Cook did not waiver thereby denying and discontinuing a reasonable accommodation that was already in effect.

88. As a result of Mountaire's failure to accommodate, Ms. Boyd suffered the damages stated in Paragraph 53.

89. This willful, intentional, and unlawful action violates the laws and regulations of the United States, including, without limitation 42 U.S.C. § 12101, *et seq.*

### COUNT VII – HOSTILE WORK ENVIRONMENT BASED UPON DISABILITY

90. Plaintiff reincorporates all of the foregoing assertions as if they are specifically stated in this Count.

91. Ms. Boyd is in a protected class as she had a disability, sleep apnea. She was subject to intentional harassment by Cook because of her disability (separately or in conjunction with other bases).

92. Cook's harassment was severe or pervasive.

93. Cook's harassment would detrimentally affect a reasonable person and did, in fact, detrimentally affect Ms. Boyd.

94. Cook had the ability to fire Ms. Boyd and was therefore her supervisor.

95. Alternatively, Mountaire knew or should have known of Cook's harassment of Ms. Boyd and failed to reasonably supervise Cook allowing Ms. Boyd to be harassed.

96. As a result of Mountaire's discrimination on the basis of disability, Ms. Boyd suffered the damages identified in Paragraph 53.

97. This willful, intentional, and unlawful action violates the laws and regulations of the United States, including, without limitation 42 U.S.C. § 12101, *et seq.*

## COUNT VIII – DISPARATE TREATMENT BASED UPON DISABILITY

98. Plaintiff reincorporates all of the foregoing assertions as if they are specifically stated in this Count.

99. Ms. Boyd was in a protected class because she had multiple disabilities: sleep apnea and the health conditions that required her to take time off in November 2021. As recounted above, the harassment by Cook caused Ms. Boyd's health to suffer to the point that she had to take time off from work in November 2021. These health conditions constituted a disability as they were documented and as they were impacting her ability to work.

100. Ms. Boyd was qualified for the job of the Complex Human Resources manager for the Facility.

101. Despite being qualified for the job of the Complex Human Resources manager for the Facility, as soon as Ms. Boyd indicated she needed to take time off from work due to her disability, Cook said he was going to "investigate her."

102. When she returned from her medical leave, she was given a negative performance review and told she would not be receiving a raise. This led to her constructive discharge. Failing to receive the raise and her constructive discharge are adverse employment actions.

103. As a result of Mountaire's intentional discrimination on the basis of disability, separately or in conjunction with another basis, Ms. Boyd suffered the damages identified in Paragraph 53.

104. This willful, intentional, and unlawful action violates the laws and regulations of the United States, including, without limitation 42 U.S.C. § 12101, *et seq.*

### COUNT IX – RETALIATION UNDER THE ADA

105. Plaintiff reincorporates all of the foregoing assertions as if they are specifically stated in this Count.

106. In November 2021, Ms. Boyd took medical leave for a disability created by the harassment from Cook.

107. When Ms. Boyd informed Cook she was taking medical leave, he told her – on the same day – that he was going to "investigate" her.

108. When she returned from her medical leave, she was given a negative performance review and told she would not be receiving a raise. This led to her constructive discharge. Failing to receive the raise and her constructive discharge are adverse employment actions.

109. As a result of Mountaire's intentional discrimination on the basis of disability, Ms. Boyd suffered the damages identified in Paragraph 53.

110. This willful, intentional, and unlawful action violates the laws and regulations of the United States, including, without limitation 42 U.S.C. § 12101, *et seq.*

## COUNT X – RETALIATION UNDER FMLA

111.    Plaintiff reincorporates all of the foregoing assertions as if they are specifically stated in this Count.

112.    In November 2021, Ms. Boyd exercised her rights under the FMLA by taking medical leave necessitated by the harassment from Cook.

113.    When Ms. Boyd informed Cook she was taking medical leave, he told her – on the same day – that he was going to "investigate" her.

114.    When she returned from her medical leave, she was given a negative performance review and told she would not be receiving a raise.  This led to her constructive discharge.  Failing to receive the raise and her constructive discharge are adverse employment actions.

115.    As a result of Mountaire's intentional discrimination on the basis of Ms. Boyd taking FMLA leave, Ms. Boyd suffered the damages identified in Paragraph 53.

116.    This willful, intentional, and unlawful action violates the laws and regulations of the United States, including, without limitation 29 U.S.C. § 2601, *et seq.*

**WHEREFORE** Plaintiff Tina Boyd respectfully requests this Court:

A.      Enter judgment in her favor and against Mountaire Farms of Delaware, Inc.;

B.      Award her back pay and front pay as she can prove;

C.      Award her compensatory damages;

D.      Award her special damages as she can prove;

E.      Award her costs and attorneys' fees;

F.      Award her pre- and post-judgment interest; and

G. Grant such other relief as the Court deems appropriate.

**JACOBS & CRUMPLAR, P.A.**

/s/ Patrick C. Gallagher
Patrick C. Gallagher, Esq. (DE Bar 5170)
750 Shipyard Drive, Suite 200
Wilmington, DE 19801
(t) 302-656-5445
(f) 302-656-5875
pat@jcdelaw.com
*Attorney for Plaintiff*

DATE: April 23, 2023